# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

FRANK J. ANDREWS, Jr. and
DAVID J. STROUD,

                Plaintiffs,

                                        Case No. 09-C-718

      -vs-

JP MORGAN CHASE BANK, N.A.,

                Defendant/Third-Party Plaintiff,

      -vs-

MILWAUKEE MILE HOLDINGS, LLC and
MILWAUKEE MILE MARKETING, LLC,

                Third-Party Defendants.

# DECISION AND ORDER

      This matter relates to JP Morgan Chase Bank's issuance of a standby letter of credit in favor of the Wisconsin State Fair Park Board. The purpose of the letter of credit was to secure certain payment obligations on behalf of Milwaukee Mile Holdings, LLC (MMH), which had entered into a license agreement with the Board to operate the Milwaukee Mile motor speedway. In July of 2009, the Board submitted a draw request to the Bank in the amount of $2,613,338.05. MMH attempted, but failed, to enjoin payment in state court, and the Bank made payment under the draw request.

      Chase Bank moved for summary judgment on its claim for repayment from MMH. The Bank also moved for summary judgment against Frank Andrews and David Stroud,

MMH investors who guaranteed repayment under the letter of credit. Finally, the Bank moved for summary judgment on its guaranty claim against Milwaukee Mile Marketing, LLC ("MMM").

After briefing on these motions was complete, the Court raised the issue of whether it could exercise subject matter jurisdiction over this case. The parties amended their pleadings as directed. However, MMH and MMM moved to dismiss, and on February 13, the Bank consented to the dismissal of its third-party complaint against MMH and MMM for lack of subject matter jurisdiction.

The Court is satisfied that it has jurisdiction over the Bank's claims against Andrews and Stroud. The Bank is a citizen of Ohio, the state "in which its main office, as set forth in its articles of association, is located." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006). Andrews and Stroud are citizens of California. The amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a)(1).

For the reasons that follow, the Bank's motion for summary judgment against Andrews and Stroud is denied.

## BACKGROUND

On December 19, 2005, MMH entered into a license agreement with the Board to operate the Milwaukee Mile motor speedway (the 2005 License Agreement). To secure its obligations to the Board under the 2005 License Agreement, MMH sought a standby letter of credit from JP Morgan Chase Bank.

In late 2005, there were two senior executives of MMH who shared responsibility for management of the company: Craig Stoehr, who had a background promoting boat races, and was responsible for marketing automobile racing for MMH; and Andrew Randall, a former banking executive, who was the "business guy" responsible for overseeing MMH's finances.

To issue a standby letter of credit in this case, the Bank required that two investors in MMH, Frank Andrews and David Stroud, sign guarantees. According to internal Bank documents, the Bank was relying completely on these guarantors when it issued the standby letter of credit and the Bank gave no weight to the ability or capacity of MMH to make any payments to the Bank. No representative of the Bank ever informed Andrews or Stroud that the Bank was always completely reliant on the guarantors for repayment on any draws under the Letter of Credit, or that the credit was underwritten on the wherewithal of the guarantors with no weight given to MMH as a repayment source.

Representatives of the Bank, Andrews, Stroud, and representatives of MMH, including Stoehr, held a face to face meeting in Milwaukee on December 19, 2005 to discuss the standby letter of credit transaction and to sign the Bank's loan documents. Randall was not present at that meeting. Andrews and Stroud traveled from California for this meeting, and to attend other events relating to MMH. At the meeting, Andrews and Stroud confirmed with Bank representatives, including Jay Isaman, an officer of the Bank who was the relationship manager for MMH, that under the terms of the agreement between the Bank and MMH, the Board could draw under the standby letter of credit only if it represented to the Bank in writing that MMH had breached its payment obligations to the Board under the 2005

License Agreement, and then failed to cure those breaches. Andrews and Stroud signed written guarantees at the December 19, 2005 meeting.

Prior to the December 19 meeting, the Bank provided MMH with an Application and Agreement for Irrevocable Standby Letter of Credit (the "LC Application and Agreement"), and instructions for completing the same (the "LC Application Instructions"). Stoehr completed the LC Application and Agreement on behalf of MMH. The LC Application Instructions advise the Applicant to insert in the lower portion of the first page of the LC Application and Agreement the statement that must be presented by the Beneficiary (the Board) to the Bank in order to draw on the standby letter of credit. This is sometimes referred to as the "Demand Clause." The Beneficiary must strictly comply with the requirements set forth in the Demand Clause in order to draw on a standby letter of credit. Stoehr inserted the following Demand Clause into the LC Application and Agreement: "For breach of obligor's payment obligations under paragraph 6(a) of that certain license agreement, dated as of December 19, 2005, by and between obligor and beneficiary, and failure to cure such breach as provided in paragraph 22(a)(1) of said license agreement within the period specified." Stoehr signed the LC Application and Agreement on December 19, 2005. Isaman signed the LC Application and Agreement for the Bank on December 21, 2005.

At the December 19 meeting, Isaman did not inform Andrews or Stroud that: (1) the Board had requested, and the Bank had proposed, a letter of credit that would contain a clause permitting the Board to draw on the letter of credit if it received a notice of non-

-4-

extension of the letter of credit and MMH did not provide alternate security acceptable to the Board (referred to later as the "Additional Demand Clause" or the "Non-Renewal Draw Clause"); (2) that the LC Application and Agreement did not accurately describe the letter of credit that the Bank had proposed it would issue three days earlier on December 16, 2005; or (3) that the Board could draw on the letter of credit if it received a notice of non-extension of the letter of credit and MMH did not provide alternate security acceptable to the Board, regardless of whether MMH had defaulted on its own obligations to the State under the 2005 License Agreement. Neither Andrews nor Stroud would have executed guarantees at the December 19, 2005 meeting if representatives of the Bank had informed them that the Board could make a draw on the letter of credit even in the absence of a payment default under the 2005 License Agreement by stating that the Board had received notice of non-extension of the Letter of Credit and that MMH had failed to provide alternate security acceptable to the Board.

In order to sign the guarantees, Andrews and Stroud wanted a requirement that the Bank obtain approval from two representatives of MMH, both Stoehr and Randall, before entering into any financial transactions with MMH. At the December 19 meeting, Andrews and Stroud informed Isaman as such. Several days later on December 28, 2005, both Stoehr and Randall on behalf of MMH, signed the Bank's Limited Liability Company Appointment Form specifying that approval of *both* Stoehr and Randall was required in order to enter into or modify any financial transaction with MMH, including "applications and reimbursement agreements for letters of credit."

-5-

On December 29, 2005, the Bank issued standby letter of credit CTCS-223266 (the "Original Letter of Credit"). The Original Letter of Credit substantially conformed to the LC Application and Agreement that Stoehr signed on behalf of MMH on December 19, 2005, and that Isaman, of the Bank, signed on December 21, 2005. The Original Letter of Credit only permitted the Board to make a draw if it stated in writing that MMH defaulted on its payment obligations under the 2005 License Agreement.

On February 3, 2006, the Bank issued an amended letter of credit in favor of the Board (the "Amended Letter of Credit"). The Amended Letter of Credit states that it amends the Original Letter of Credit "in its entirety." In addition to the Demand Clause quoted above in the Original Letter of Credit, the Amended Letter of Credit contains a second Demand Clause not present in the Original Letter of Credit. This Additional Demand Clause (also referred to as the "Non-Renewal Draw Clause") permits the Board to draw on the Amended Letter of Credit if the Board receives a notice from the Bank that the Amended Letter of Credit has not been renewed, and that MMH has failed to provide alternate security acceptable to the Board. Unlike the Original Letter of Credit, the Amended Letter of Credit does not conform to the LC Application and Agreement, and the Additional Demand Clause does not appear in the LC Application and Agreement. The Bank did not obtain signature approval from any representative of MMH, including Stoehr and/or Randall, for the Amended Letter of Credit, or any draft thereof.

In February 2008, MMH and the Board entered into a new license agreement (the "2008 License Agreement"). By its terms, the 2008 License Agreement superseded the 2005

License Agreement.  The Board sent an October 8, 2008 letter to the Bank acknowledging the same.  On December 17, 2008, the Bank sent notice to the Board that it would not renew the letter of credit upon its anniversary, and so it would expire on August 31, 2009.

On or about July 9, 2009, the Board submitted a draw request to the Bank under the terms of the Amended Letter of Credit seeking payment for $2,613,338.05 (the "$2.6 Million Draw Request").  The Board's draw request was based on the Additional Demand Clause/Non-Renewal Draw Clause.  The Bank reviewed the presentment and concluded it met the requirements of the Amended Letter of Credit.  Payment was made after MMH's attempt to enjoin payment in Dane County Circuit Court was unsuccessful.

## ANALYSIS

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party.  *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003).

The Bank moves for summary judgment on its claim that Andrews and Stroud breached their duty to reimburse the Bank for the Board's draw on the Amended Letter of Credit. Andrews and Stroud argue that the guarantees are void because the Bank's material misrepresentations induced them to execute the guarantees.

If a party to a contract "is induced to manifest his assent to the contract by a means of a fraudulent or material misrepresentation by another party to the contract, the contract is voidable if the recipient justifiably relies on the misrepresentation." *First Nat. Bank & Trust Co. of Racine v. Notte*, 293 N.W.2d 530, 532 (Wis. 1980).[1] According to Andrews and Stroud, representatives of the Bank (Jay Isaman in particular) assured them that the only way the Board could draw on the letter of credit was if MMH breached its payment obligations under the 2005 License Agreement. Instead, an alternative draft was secretly in the works that would eventually allow a draw under additional circumstances, i.e., if the letter of credit was not renewed and MMH failed to obtain alternative security. The alleged misrepresentations were material because the eventual inclusion of the Non-Renewal Draw Clause greatly increased the guarantors' exposure to liability. And the guarantors' reliance was justifiable since the Bank's assurances conformed with the LC Application and Agreement they were shown at the December 19, 2005 meeting. This evidence is more than enough to create an issue of fact as to whether the guarantees are voidable.

The Bank argues that Andrews and Stroud must produce evidence of an intent to defraud. This is incorrect. It is "not necessary that the concealment or the failure to disclose

---

[1] The parties agree that Wisconsin law governs the Bank's claims against Andrews and Stroud.

-8-

facts material to the surety be wilfully done by the creditor, or that the creditor have the intent to deceive. The motive behind the concealment or misrepresentation is immaterial." *Notte* at 534. Indeed, it is not even necessary that the "'party making a misrepresentation should have known that it was false.' [Rescission] is allowed even though the misrepresentation is innocently made because 'It would be unjust to allow one who has made false representations, even innocently, to retain the fruits of a bargain induced by such representations." *Whipp v. Iverson*, 168 N.W.2d 201, 204 (Wis. 1969) (internal citations omitted); *see also Notte* at 537 ("There is a basic inequity of allowing one party to benefit from his own misstatements or misrepresentations, however honestly he believed them to be at the time made"). In any event, the evidence suggests that the Bank *did* act with an intent to defraud since it was directly involved in the discussions with the Board pertaining to the Non-Renewal Draw Clause prior to its meeting with Andrews and Stroud on December 19, 2005.

The Bank argues that Andrews and Stroud cannot raise the defense of fraudulent inducement because the guarantees include a "blanket waiver" of all defenses. In support, the Bank cites *MBIA Ins. Co. v. Royal Indemn. Co.*, 426 F.3d 204 (3d Cir. 2005), where an insurance company (Royal) agreed to insure repayment of principal and interest on several hundred million dollars of student loans. The beneficiaries of these policies sued Royal after the loans went into default. Royal defended on the grounds that the lender on the underlying obligations fraudulently induced it to issue the policies and that this fraud entitled it to rescission. Judge (now Justice) Alito rejected this argument because Royal waived the

-9-

fraudulent inducement defense in the policies it issued to the beneficiaries. "Royal cannot possibly claim that its reliance on those [fraudulent] representations was reasonable when it waived all defenses based on reasonable reliance." *Id.* at 212. The citation to this language has facial appeal for the arguments advanced by the Bank, but *MBIA Ins.* is distinguishable because the alleged misrepresentations were made by a *third-party* to the insurance contracts the beneficiaries were attempting to enforce. *Id.* at 208 ("Royal alleges, and the beneficiaries do not dispute, that SFC procured this insurance through a spectacular fraud"). Here, Andrews and Stroud allege that their promises to guarantee repayment to the Bank were fraudulently induced *by the Bank itself*. If so, this means that the guarantees are voidable at the election of Andrews and Stroud. The Bank cannot rely on a contractual waiver provision in a contract that is void. "Of course if the contract was procured by fraud, the integration clause would not prevent inquiry into the parties' discussions before the contract was signed; the integration clause would go down the drain with the contract of which it was a part." *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1373 (7th Cir. 1990); *Morse Chain Co. v. T.W. Meiklejohn, Inc.*, 296 N.W. 106, 109 (Wis. 1941).

The Bank also cites provisions in the guarantees that purportedly grant "advance authorization" to materially alter the terms of the letter of credit. Andrews Dec., Exhibit 1004, ECF No. 84-1 ("The Guarantor authorizes the Bank, without notice or demand and without affecting Guarantor's obligations hereunder, from time to time, to: (a) renew, *modify*, compromise, rearrange, restate, consolidate, extend, accelerate, postpone, grant any indulgence or otherwise change the time for payment of, *or otherwise change the terms of*

-10-

*the Liabilities or any part thereof . . .*"). Once again, the Bank cannot pin its hopes on language in an agreement that is void as a matter of law. It could be argued that this language makes the guarantors' reliance on the Bank's oral representations unreasonable. But the language is not clear enough to make this ruling as a matter of law. *See, e.g., Comm'l Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 938 F.2d 870, 875 (8th Cir. 1991) (a contract provision "negatives a claim of fraud" where the provision "explicitly states a fact completely antithetical to the claimed misrepresentations"). This is a factual issue, and construing the evidence in the light most favorable to Andrews and Stroud, it is simply not reasonable to conclude that they intended to grant the Bank unilateral authority to materially increase their risk under the guarantees. *Lyon Fin. Servs., Inc. v. Bella Medica Laser Ctr., Inc.*, 738 F. Supp. 2d 856 (N.D. Ill. 2010) ("If, for example, Bella and Lyon agreed, in the absence of Berg, to increase the liability under the Lease to an additional $1 Million, it would not be reasonable to conclude that Berg, when signing the Guaranty for the Lease, had the intention to agree to such an exorbitant future risk. There is no clear language in the Guaranty that indicates that Berg was agreeing to be liable for any future sum").

Finally, there is sufficient evidence to suggest that the Bank breached its duty of good faith and fair dealing. "A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, *abuse of a power to specify terms*, and interference with or failure to cooperate in the other party's performance." *Foseid v. State Bank*, 541 N.W. 2d 203, 213 (Wis. Ct.

App. 1995) (emphasis added). As the Court has already discussed, the Bank seemingly took advantage of the rather vague "advance authorization" language in the guarantees to unilaterally increase the liability exposure of Andrews and Stroud. This could be construed as a material breach, because the "essential object" of the agreement was to guarantee repayment in the event that MMH breached its obligations under the 2005 license agreement, not to also guarantee repayment if MMH couldn't come up with adequate alternative security if the letter of credit wasn't renewed. "Under Wisconsin law, a material breach of contract releases the non-breaching party from performance under the contract. A breach is material if it destroys the essential object of the agreement or deprives the non-breaching party of a benefit that the party reasonably expected." *Int'l Prod. Specialists, Inc. v. Schwing Am., Inc.*, 580 F.3d 587, 595 (7th Cir. 2009) (internal citations omitted).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. MMH and MMM's motion to dismiss the amended third-party complaint [ECF No. 111] is **GRANTED**;

2. Chase Bank's motion for summary judgment [ECF No. 75] is **DENIED**; and

3. The trial in this matter is scheduled to commence on **June 11, 2012.** Motions in limine must be filed on or before **April 13, 2012**. Responses are due on **April 27, 2012**. The Court will not consider reply briefs.

Dated at Milwaukee, Wisconsin, this 17th day of February, 2012.

**BY THE COURT**:

_____
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

-13-

Case 2:09-cv-00718-RTR   Filed 02/17/12   Page 13 of 13   Document 118